UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARLOW TODD EGGUM,

                        Petitioner,

        v.

DONALD HOLBROOK,

                        Respondent.

Case No. C14-1328-RAJ-MAT

REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Petitioner, a state prisoner who is currently confined at the Washington State Penitentiary in Walla Walla, Washington, seeks relief under 28 U.S.C. § 2254 from a 2011 Whatcom County Superior Court judgment and sentence.  Although petitioner initiated this action *pro se*, he is now represented by the Office of the Federal Public Defender.

Respondent has filed an answer (Dkt. 133) to petitioner's second amended habeas petition ("SAP") (Dkt. 125) and submitted relevant portions of the state court record.  Petitioner has filed a reply in support of his SAP.  (Dkt. 136.)  Petitioner requests oral argument, an evidentiary hearing, and accelerated consideration.  (*See id.*)  Petitioner also filed a motion to expand the record.  (Dkt. 126.)  After reviewing the parties' submissions, the Court ordered

REPORT AND RECOMMENDATION - 1

supplemental briefs, which the parties supplied.  (Dkts. 139 (order), 143 (respondent's brief), 144 (petitioner's brief).)  Having considered the parties' submissions, the balance of the record, and the governing law, the Court recommends that petitioner's habeas petition be GRANTED as to his First Amendment challenge to Washington's intimidating a public servant statute and DENIED as to his remaining claims, that petitioner's request for an evidentiary hearing be DENIED, that petitioner's motion to expand the record be GRANTED in part, and that a certificate of appealability be GRANTED in part.[1]

## II.     FACTUAL AND PROCEDURAL HISTORY

The Washington State Court of Appeals ("Court of Appeals"), on direct appeal, summarized the facts relevant to petitioner's conviction as follows:

> Between 2007 and 2009, Eggum was serving a sentence imposed following his guilty plea to two counts of felony stalking and one count of felony harassment. The victim of these offenses was Eggum's former spouse, Janice Gray.  In 2009, before his scheduled release date, the State filed a new criminal complaint against Eggum based on letters he wrote while in prison.  In some cases, the recipient of Eggum's letters provided the letters to law enforcement.  The charges were also based on letters Eggum wrote to his mother that were copied and sent to the Whatcom County Sheriff's Office by the Department of Corrections (DOC).

> Following a jury trial, Eggum was convicted of five charges based on his letters: two counts of intimidating a public servant (counts I and III), two counts of felony harassment (counts IV and V), and one count of felony stalking (count VI).[2]  The new offenses involved three victims: Gray; Eric Richey, the prosecutor who handled two prior prosecutions of Eggum; and Community Correction Officer (CCO) Melissa Hallmark.

> *****

> Eggum's [intimidating a public servant] conviction involving the CCO was based on a letter he wrote to her in 2009 after she denied approval of his proposed release address.  Eggum accused Hallmark of denying approval in order to thwart his plan

---

[1] Petitioner's request for oral argument is DENIED.  The parties have thoroughly briefed the issues and oral argument would not be of assistance to the Court. *See Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998) (court may deny request for oral argument when parties submit briefs to the court).

[2] [Court of Appeals footnote]  The jury acquitted Eggum of count II, an additional count of felony harassment.

REPORT AND RECOMMENDATION - 2

to sell his [pornographic] movies containing images of Gray upon release. He threatened to file suit against Hallmark for her unlawful actions and also to release 1,000 films in Gray's hometown in Newfoundland, Canada in retaliation for her decision. He further stated, "For every month my release date is delayed past my ERD, I am going to release an additional thousand free promotional movies into the St. Johns [Newfoundland] market." Eggum also told Hallmark that if his elderly mother died while his release was delayed because of her actions, "I'[ll] hold you personally responsible." Exhibit (Ex.) 25.

A separate June 2009 letter forms the basis for Eggum's conviction for intimidating a public servant involving the prosecutor. In this letter, Eggum told Richey he should be less concerned about his business plans upon release and more concerned about the fact that if he remains in prison, he will continue to sell pornographic videos to fellow inmates on McNeil Island, many of whom are sex offenders. He wrote, "And here you are filing new charges against me, keeping me in prison where I tell everyone my story. Doesn't make sense." Ex. 26. He told Richey he believed the new charge was baseless and offered to relocate to Snohomish County, stay out of the town where Gray lives, and withdraw a bar complaint filed against Richey in exchange for dismissal of the charge.

(Dkt. 125-8 at 93-94, 102-103.) With respect to petitioner's sentence, the Court of Appeals explained:

The State alleged and the jury found an aggravating factor with respect to each count. As to the three counts involving the CCO and the prosecutor, the jury found that Eggum committed the crimes against a public official or court officer in retaliation for performance of his or her duties to the criminal justice system. *See* RCW 9.94A.535(3)(x). As to the two crimes involving Gray, the jury found the crimes were part of an ongoing pattern of psychological abuse manifested by multiple incidents over a prolonged period of time. *See* RCW 9.94A.535(2)(h)(i).

Based on Eggum's four prior felony convictions, the top of the standard range was 60 months on the stalking count and 57 months on all other counts. The trial court found that each aggravating factor was a substantial and compelling reason to impose an exceptional sentence and sentenced Eggum to a total term of 240 months' imprisonment.

(*Id.* at 94-95.)

Petitioner filed a direct appeal through counsel and a *pro se* statement of additional grounds.[3] (Dkt. 125-5 at 68-122; Dkt. 125-6.) The Court of Appeals affirmed in an unpublished

---

[3] Petitioner filed numerous other *pro se* motions in the Court of Appeals while his appeal was pending. (*See* Dkt. 125 at Exs. 43, 45-47, 49, 54, 56-57, 61-62, 65-67, 70-71.)

REPORT AND RECOMMENDATION - 3

1  opinion and denied petitioner's *pro se* request for reconsideration. (Dkt. 125-8 at 93-109, 121-

2  41, 143.) Petitioner, proceeding *pro se*, unsuccessfully sought discretionary review by the

3  Washington Supreme Court. (*See id.* at 144-64, 167-76; Dkt. 125-9 at 1-37, 44-45, 86-102.)

4  Petitioner subsequently filed numerous *pro se* personal restraint petitions in the Court of Appeals

5  and Washington Supreme Court.[4] (*See* Dkt. 133 at 11-16.)

6           Petitioner filed the instant federal habeas petition *pro se* in August 2014. (*See* Dkt. 1.)

7  After it became apparent petitioner had personal restraint petitions that were still pending in the

8  state courts, the Court granted respondent's motion to stay and abey this action. (Dkt. 42; *see*

9  *also* Dkt. 63.) Petitioner subsequently moved for the appointment of counsel. (Dkt. 82.) On

10 May 17, 2017, the Court temporarily lifted the stay, granted petitioner's motion, and appointed

11 the Office of the Federal Public Defender. (Dkt. 92; *see also* Dkts. 83-91.) With leave of the

12 Court, petitioner filed an amended habeas petition. (Dkts. 99-100.) Petitioner also filed a

13 motion to stay and abey this action so that he could file one last personal restraint petition in the

14 state courts with the assistance of counsel. (Dkt. 101.) On August 10, 2017, the Court granted

15 petitioner's motion and stayed this action. (Dkt. 103.) Petitioner did not prevail on the personal

16 restraint petition, and on January 2, 2019, the parties filed a joint motion to lift the stay. (Dkt.

17 108.)

18           On April 17, 2019, the Court ordered petitioner to file a second amended habeas petition.

19 (Dkt. 122.) On May 22, 2019, petitioner filed his SAP, supporting evidence, and a motion to

20 expand the record. (Dkts. 125, 126.) Respondent opposed the motion to expand the record, and

21 petitioner filed a reply. (Dkts. 129, 130.)

22

23

---

[4] The Court provides a detailed discussion of the state court filings that are relevant to exhaustion in section IV.B.

REPORT AND RECOMMENDATION - 4

On June 12, 2019, respondent filed an answer to the SAP and relevant excerpts from the state court record.  (Dkts. 133, 134.)  On June 26, 2019, petitioner filed his reply in support of his SAP.  (Dkt. 136.)  On August 30, 2019, the Court directed the parties to file supplemental briefs. (Dkt. 139.)  After being granted an extension of time, the parties filed their supplemental briefs on October 4, 2019.  (Dkts. 143, 144.)  On December 31, 2019, petitioner filed a notice to supplemental authority, arguing that a new Court of Appeals decision was relevant to his claims. (Dkt. 145.)  At the direction of the Court (Dkt. 146), respondent filed a brief addressing this new authority (Dkt. 147).  Both parties subsequently requested leave to file additional briefs (Dkts. 148, 149), which the Court denied (Dkt. 150).

### III.    GROUNDS FOR RELIEF

Petitioner's original *pro se* petition raised 26 grounds for relief.  (Dkt. 13.)  His SAP waives some of the original grounds, consolidates others, and presents them in a different order. (*See* Dkt. 125.)  The Court will refer to the grounds for relief in the order they are presented in the SAP.  Those claims, and the original grounds for relief to which petitioner claims they relate,[5] may be summarized as follows:

> SAP Ground 1:  The First Amendment required the State to prove a "true threat" of bodily harm or death to convict petitioner of intimidating a public servant. (Original Grounds 11, 16.)  (Dkt. 125 at 25-39.)
>
> SAP Ground 2:  Petitioner received ineffective assistance of appellate counsel when his attorney failed to raise the meritorious "true threat" argument.  (Original Ground 26.)  (Dkt. 125 at 39-47.)
>
> SAP Ground 3:  Insufficient evidence exists to uphold the intimidating a public servant convictions because there is no evidence petitioner made a "true threat" of bodily harm or death.  (Dkt. 125 at 48-51.)
>
> SAP Ground 4:  Numerous trial court evidentiary rulings prevented petitioner from presenting his defense, in violation of due process.  (Original Grounds 5, 7-8, 10.)  (Dkt. 125 at 51-54.)

---

[5] Respondent argues that some grounds in the SAP do not relate back to the original petition.

REPORT AND RECOMMENDATION - 5

SAP Ground 5:  Petitioner's prosecution for threatening to do something he had a legal right to do—distribute pornographic videos of Ms. Gray—violated his right to due process.  (Original Ground 9.)  (Dkt. 125 at 54-55.)

SAP Ground 6:  The prosecutor constructively amended the information in violation of petitioner's due process rights.  (Original Ground 13.)  (Dkt. 125 at 55-57.)

SAP Ground 7:  There is insufficient evidence to support petitioner's conviction for stalking Ms. Gray.  (Original Grounds 21-24.)  (Dkt. 125 at 58-59.)

## IV.    DISCUSSION

In SAP Ground 1, petitioner argues that Washington's intimidating a public servant statute violates the First Amendment as applied to him and because it is facially overbroad. (Dkt. 127 at 25.)  SAP Grounds 2 through 6 are also directed at invalidating his convictions under the intimidating a public servant statute.  SAP Ground 7 seeks to overturn his conviction for stalking.  As discussed below, the Court concludes that petitioner is entitled to habeas relief on SAP Ground 1 but not on SAP Ground 7.  Because SAP Grounds 2 through 6 attack the same convictions as SAP Ground 1, the Court does not address those claims except to the extent the parties' arguments are relevant to consideration of SAP Ground 7.

A.    SAP Ground 1 – First Amendment Challenge to Convictions for Intimidating a Public Servant Convictions

The parties dispute whether SAP Ground 1 is barred by the statute of limitations and whether petitioner is entitled to relief on the merits.  The Court concludes that petitioner timely filed SAP Ground 1 and is entitled to habeas relief on the merits of the claim.

1.    *Statute of Limitations*

There is no dispute that petitioner filed his original habeas petition within the one-year statute of limitations period set forth in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") and that he filed his SAP after the limitations period expired.  Respondent contends

1   that SAP Ground 1 is untimely because it raises newly asserted claims that do not relate back to

2   the original petition under *Mayle v. Felix*, 545 U.S. 644 (2005).  (Dkt. 133 at 24-28.)  In *Mayle*,

3   the petitioner's original *pro se* habeas petition was timely, but his amended petition, which added

4   a new claim, was filed after the limitations period expired.  545 U.S. at 649.  The Supreme Court

5   held, "An amended habeas petition . . . does not relate back (and thereby escape AEDPA's one-

6   year time limit) when it asserts a new ground for relief supported by facts that differ in both time

7   and type from those the original pleading set forth."  *Id.* at 650; *see also id.* at 664 ("So long as

8   the original and amended petitions state claims that are tied to a common core of operative facts,

9   relation back will be in order.").  The petitioner's original petition raised a Sixth Amendment

10   Confrontation Clause claim based on the admission at trial of a witness's videotaped statements,

11   while the amended petition added a Fifth Amendment challenge to statements the petitioner

12   made before trial.  *Id.* at 657.  The Supreme Court determined that the petitioner's claims

13   "targeted separate episodes" that occurred "at a different time and place," and therefore the

14   newly added claim did not relate back to the original petition and was untimely.  *Id.* at 660.

15        Petitioner argues that SAP Ground 1 is the same claim as his Original Grounds 11 and

16   16, and therefore *Mayle*'s relation back analysis does not apply.  (Dkt. 136 at 3.)  The Court

17   agrees.  In Original Ground 11, petitioner asserted that the First Amendment protected the

18   statements he made in the letters to Ms. Hallmark and Mr. Richey, and that the trial court used a

19   faulty definition of "threat" to convict him of intimidating a public servant.  (Dkt. 13 at 59.)  In

20   Original Ground 16, petitioner maintained that his conviction for intimidating a public servant

21   required evidence of a "true threat," and that absent such a requirement, his conviction violated

22   his First Amendment rights.  (*Id.* at 64.)  He stated, "Had Eggum threatened bodily harm or death

23   if the decision wasn't changed, then that would have been [intimidating a public servant]."  (*Id.*)

REPORT AND RECOMMENDATION - 7

He further stated, "The question before this Court is whether count-1 requires a valid threat or a 'true threat.'" (*Id.*)

Like Original Grounds 11 and 16, SAP Ground 1 asserts that the First Amendment required the State to prove a "true threat" of bodily harm or death to convict petitioner of intimidating a public servant. (Dkt. 125 at 25.) Petitioner fleshes out this claim by arguing that the intimidating a public servant statute was unconstitutional as applied to him and also on its face. (*See id.* at 26-27, 30-39.) The as-applied claim is the same as the claims in his original petition. He did not assert the facial challenge in his original petition, but to the extent *Mayle*'s relation back analysis is required, it is clearly satisfied because both the original and amended claims "are tied to a common core of operative facts," namely the statements petitioner made in his letters to Ms. Hallmark and Mr. Richey, which did not threaten bodily harm or death, and the non-"true threat" basis on which the jury was permitted to convict him. *Mayle*, 545 U.S. at 664. The Supreme Court also cited with approval the principle that relation back is ordinarily allowed "when the new claim is based on the same facts as the original pleading and only changes the legal theory." *Id.* at 664 n.7 (quoting 3 J. Moore, et al., Moore's Federal Practice § 15.19[2], p. 15-82 (3d ed. 2004)). Thus, the Court concludes that SAP Ground 1 does not run afoul of the statute of limitations and should be considered on the merits.[6]

2. *Legal Standards for AEDPA Review*

Under AEDPA, a habeas petition may be granted with respect to any claim adjudicated on the merits in state court only if (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme

---

[6] There is no dispute that petitioner properly exhausted SAP Ground 1 as required by AEDPA. (*See* Dkt. 133 at 17.)

1    Court, or (2) the decision was based on an unreasonable determination of the facts in light of the

2    evidence presented.  28 U.S.C. § 2254(d).  This action involves only § 2254(d)(1).

3           Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition

4    only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a

5    question of law, or if the state court decides a case differently than the Supreme Court has on a

6    set of materially indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

7    Under the "unreasonable application" clause, a federal habeas court may grant the writ only if

8    the state court identifies the correct governing legal principle from the Supreme Court's

9    decisions, but unreasonably applies that principle to the facts of the petitioner's case.  *See id*. at

10   407-09.  The Supreme Court has made clear that a state court's decision may be overturned only

11   if the application is "objectively unreasonable."  *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003).

12   The Supreme Court has further explained that "[a] state court's determination that a claim lacks

13   merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

14   correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011)

15   (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

16          Clearly established federal law, for purposes of AEDPA, means "the governing legal

17   principle or principles set forth by the Supreme Court at the time the state court render[ed] its

18   decision."  *Lockyer*, 538 U.S. at 71-72.  This includes the Supreme Court's holdings, not its

19   dicta.  *Id.*  "If no Supreme Court precedent creates clearly established federal law relating to the

20   legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary

21   to or an unreasonable application of clearly established federal law."  *Brewer v. Hall*, 378 F.3d

22   952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

23

In considering claims pursuant to § 2254(d), the Court is limited to the record before the state court that adjudicated the claim on the merits, and the petitioner carries the burden of proof. *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011); *see also Gulbrandson v. Ryan*, 738 F.3d 976, 993 (9th Cir. 2013).

3.      *State Court Adjudication*

Washington's intimidating a public servant statute states:  "A person is guilty of intimidating a public servant if, by use of a threat, he or she attempts to influence a public servant's vote, opinion, decision, or other official action as a public servant."  RCW 9A.76.180(1).  "Threat" means "(a) To communicate, directly or indirectly, the intent immediately to use force against any person who is present at the time; or (b) Threats as defined in RCW 9A.04.110."  RCW 9A.76.180(3).  Under RCW 9A.04.110, "threat" means to communicate, directly or indirectly, the intent:

> (a) To cause bodily injury in the future to the person threatened or to any other person; or
>
> (b) To cause physical damage to the property of a person other than the actor; or
>
> (c) To subject the person threatened or any other person to physical confinement or restraint; or
>
> (d) To accuse any person of a crime or cause criminal charges to be instituted against any person; or
>
> (e) To expose a secret or publicize an asserted fact, whether true or false, tending to subject any person to hatred, contempt, or ridicule; or
>
> (f) To reveal any information sought to be concealed by the person threatened; or
>
> (g) To testify or provide information or withhold testimony or information with respect to another's legal claim or defense; or
>
> (h) To take wrongful action as an official against anyone or anything, or wrongfully withhold official action, or cause such action or withholding; or

1    (i) To bring about or continue a strike, boycott, or other similar collective action
2    to obtain property which is not demanded or received for the benefit of the group
     which the actor purports to represent; or

3    (j) To do any other act which is intended to harm substantially the person
     threatened or another with respect to his or her health, safety, business, financial
4    condition, or personal relationships.

5    RCW 9A.04.110(28).

6         With respect to the intimidating a public servant counts in this case, Counts I and III, the

7    trial judge instructed the jury:

8         A person commits the crime of intimidating a public when he, by use of a threat,
          attempts to influence a public servant's opinion, decision, or other official action
9         as a public servant.

10        *****

11        Threat means to communicate, directly or indirectly, the intent to cause bodily
          injury in the future to the person threatened or to any other person; or to expose a
12        secret or publicize an asserted fact, whether true or false, tending to subject any
          person to hatred, contempt, or ridicule; or to reveal any information sought to be
13        concealed by the person threatened; or to do any other act that is intended to harm
          substantially the person threatened or another with respect to that person's health,
14        safety, business, financial condition, or personal relationships.

15        To be a threat, a statement or act must occur in a context or under such
          circumstances where a reasonable person, in the position of the speaker, would
16        foresee that the statement or act would be interpreted as a serious expression of
          intention to carry out the threat rather than as something said in jest, idle talk, or
17        political argument.

18   (Dkt. 125-5 at 10, 13.)  The jury instructions thus incorporated subsections (a), (e), (f), and (j) of

19   RCW 9A.04.110(28).  The jury found petitioner guilty of Counts I and III.  (Dkt. 125-5 at 42,

20   44.)

21        In his most recent personal restraint petition, filed through counsel, petitioner argued that

22   he fell within an exception to the one-year time bar for personal restraint petitions because the

23   "statute he was convicted of violating, RCW 9A.76.180 (incorporating the threat definition at

REPORT AND RECOMMENDATION - 11

1    RCW 9A.04.110(28)), is unconstitutional both as applied to his conduct and because it is facially

2    overbroad." (Dkt. 125-10 at 14; *see also id.* at 25-26.) With respect to his as-applied challenge,

3    petitioner specifically reiterated each definition of "threat" included in the jury instructions. (*Id.*

4    at 26.) He also argued that given the testimony presented at trial and the prosecutor's arguments,

5    the jury "must have relied solely on definitions of 'threat' that failed to require a threat of bodily

6    harm or death." (*Id.* at 27.) Petitioner further argued that RCW 9A.76.180 was

7    "unconstitutionally overbroad because the vast majority (if not all) of its threat definitions

8    address speech that is fully protected by the First Amendment." (*Id.* at 30.) The State responded

9    that the intimidating a public servant statute was constitutional because its restrictions complied

10   with the requirements for regulating speech in a nonpublic forum as they were "reasonable in

11   light of its important purposes and viewpoint neutral." (*Id.* at 60; *see also id.* at 65.) The State

12   further argued that petitioner's as-applied challenge failed because states can properly regulate

13   protected speech. (*Id.* at 80-81.) The Washington Supreme Court ruled:

14           Mr. Eggum argues that he falls within the exemption [to the one-year time bar]
             for convictions based on unconstitutional statutes. RCW 10.73.100(2).
15           Specifically, he contends that the intimidation of a public official statute is
             unconstitutionally overbroad in that it allows convictions for threats other than
16           "true threats" to kill or cause physical harm. *See Elonis v. United States*, 135 S.
             Ct. 2001, 2009, 192 L. Ed. 2d 1 (2015). Mr. Eggum's convictions arose out of
17           threats made to a prosecutor and a community corrections officer that he would
             release pornographic videos of his former wife in her hometown unless the public
18           officials complied with his wishes.

19           As relevant here, the statute of conviction defines a "threat" to include any act
             that communicates directly or indirectly, intent "[t]o expose a secret or publicize
20           an asserted fact, whether true or false, tending to subject any person to hatred,
             contempt, or ridicule." RCW 9A.04.110(28)(e). Because Mr. Eggum fails to
21           demonstrate that he did not make a "serious expression" of intent to subject his
             former wife to ridicule through publicizing the videos, he fails to show that the
22           statute was applied unconstitutionally to his convictions. *See Virginia v. Black*,
             538 U.S. 343, 359, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003). We also find his
23           facial challenge unavailing.

REPORT AND RECOMMENDATION - 12

1   (Dkt. 125-10 at 1-2.)  The Washington Supreme Court thus held that petitioner failed to show

2   that the exemption to the time bar applied to him and dismissed his personal restraint petition as

3   untimely.  (*Id.* at 2.)

4       4.      *First Amendment Overview*

5       As noted, petitioner challenges the intimidating a public servant statute as-applied to him

6   and as facially overbroad.  "As a general matter, a facial challenge is a challenge to an entire

7   legislative enactment or provision," *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011),

8   and a successful facial challenge "invalidates the law itself," *Italian Colors Restaurant v.*

9   *Becerra*, 878 F.3d 1165, 1175 (9th Cir. 2018) (quoted source omitted).  "A paradigmatic as-

10  applied attack, by contrast, challenges only one of the rules in a statute, a subset of the statute's

11  applications, or the application of the statute to a specific circumstance."  *Hoye*, 653 F.3d at 857

12  (citation and quotation marks omitted).  "[A] successful as-applied challenge invalidates only the

13  particular application of the law."  *Italian Colors*, 878 F.3d at 1175 (internal quotation and

14  citation omitted).  "Facial and as-applied challenges can be viewed as two separate inquiries."

15  *Acosta v. City of Costa Mesa*, 718 F.3d 800, 822 (9th Cir. 2013) (citing *Bd. of Trs. of State Univ.*

16  *of New York v. Fox*, 492 U.S. 469, 482-86 (1989); *City Council v. Taxpayers for Vincent*, 466

17  U.S. 789, 800 n.19 (1984) (stating that an overbroad regulation of speech may be facially invalid,

18  even though its application in the instant case is constitutional); *City of Houston, Tex. v. Hill*, 482

19  U.S. 451, 457 (1987) (illustrating that although the Court of Appeals found a statute facially

20  unconstitutional, the Supreme Court nevertheless left undisturbed the district court's ruling that

21  the statute had not been applied in an unconstitutional manner)).

22      In his supplemental briefing, petitioner suggests the Court may wish to address his facial

23  challenge first, and only turn to his as-applied challenge if necessary.  (*See* Dkt. 144 at 3-4, 19-

REPORT AND RECOMMENDATION - 13

20.)  While petitioner cites to some authority suggesting a facial challenge may be considered

before an as-applied challenge (*see id.*), there is also countervailing guidance from the Supreme

Court, which has explained that it is "not the usual judicial practice . . . nor do we consider it

generally desirable, to proceed to an overbreadth issue unnecessarily—that is, before it is

determined that the statute would be valid as applied," *Bd. of Trustees of State Univ. of N.Y. v.

Fox*, 492 U.S. 469, 484-85 (1989); *see also New York v. Ferber*, 458 U.S. 747, 768 (1982)

(striking down a statute under facial attack is employed "with hesitation and then only as a last

resort") (internal quotation and citation omitted).  Given this authority, the Court will address

petitioner's as-applied challenge first.  *See Porter v. Gore*, 354 F. Supp. 3d 1162, 1174 (S.D. Cal.

2018) (concluding that court should address as-applied challenge before facial challenge).

### 5.    *AEDPA Review of Petitioner's As-Applied Claim*

The essence of petitioner's as-applied challenge is that, contrary to clearly established

Supreme Court law, the Washington Supreme Court impermissibly expanded the "well-defined

and narrowly limited classes of speech," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72

(1942), within which the Supreme Court has permitted restrictions consistent with the First

Amendment.  The First Amendment provides that "Congress shall make no law . . . abridging the

freedom of speech."  U.S. Const., Amdt. 1.  "[A]s a general matter, the First Amendment means

that government has no power to restrict expression because of its message, its ideas, its subject

matter, or it content."  *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *Ashcroft v.

Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002)); *see also City of Houston*, 482 U.S. at 461

("Speech is often provocative and challenging. . . .  [But it] is nevertheless protected against

censorship or punishment, unless shown likely to produce a clear and present danger of a serious

substantive evil that rises far above public inconvenience, annoyance, or unrest.") (quoting

1    *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949)).  Washington's intimidating a public servant

2    statute restricts pure speech based on its content.  *State v. Dawley*, 455 P.3d 205, 213 (Wash.

3    App. 2019) ("RCW 9A.76.180 regulates pure speech" and "is a content-based restriction"); *see*

4    *also Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015) ("Government regulation of

5    speech is content based if a law applies to particular speech because of the topic discussed or the

6    idea or message expressed."); *Seals v. McBee*, 898 F.3d 587, 595 (5th Cir. 2018) (statute that

7    criminalized "threats" regulated content).  Such content-based restrictions are presumed invalid,

8    and the government bears the burden of showing their constitutionality.  *United States v. Alvarez*,

9    567 U.S. 709, 716-17 (2012).

10          The Supreme Court has approved of content-based restrictions on speech in a few

11   "historic and traditional categories [of expression] long familiar to the bar."  *Id.* at 717 (quoting

12   *Stevens*, 559 U.S. at 468, alteration in *Alvarez*).  Those categories include true threats,

13   incitement, obscenity, defamation, speech integral to criminal conduct, so-called "fighting

14   words," child pornography, fraud, and speech presenting some grave and imminent threat the

15   government has the power to prevent.  *Id.* (collecting Supreme Court cases); *see also Stevens*,

16   599 U.S. at 468 (same); *Virginia v. Black*, 538 U.S. 343, 359 (2003) (same).  While recognizing

17   that "[m]aybe there are some categories of speech that have been historically unprotected, but

18   have not yet been specifically identified or discussed as such in our case law," the Supreme

19   Court has admonished that its decisions "cannot be taken as establishing a freewheeling authority

20   to declare new categories of speech outside the scope of the First Amendment."  *Stevens*, 559

21   U.S. at 472; *see also id.* at 470 (rejecting "free-floating test for first Amendment coverage . . .

22   [based on] an ad hoc balancing of relative social costs and benefits"); *Brown v. Entertainment*

23   *Merchants Assn.*, 564 U.S. 786, 791 (2011) ("[I]n *Stevens*, we held that new categories of

1   unprotected speech may not be added to the list by a legislature that concludes certain speech is

2   too harmful to be tolerated.").  "Before exempting a category of speech from the normal

3   prohibition on content-based restrictions . . . the Court must be presented with 'persuasive

4   evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition

5   of proscription.'"  *Alvarez*, 567 U.S. at 722 (quoting *Brown*, 564 U.S. at 792 (citing *Stevens*)).

6          Petitioner's arguments focus on *Virginia v. Black*, in which the Supreme Court defined

7   "true threats" as "encompass[ing] those statements where the speaker means to communicate a

8   serious expression of an intent to commit an act of unlawful violence to a particular individual or

9   group of individuals."  538 U.S. at 359 (citing *Watts v. United States*, 394 U.S. 705, 708 (1969)

10  (per curiam) ("political hyperbole" is not a true threat); *R.A.V. v. City of St. Paul*, 505 U.S. 377,

11  388 (1992)).  *Black* involved the constitutionality of a state statute banning cross burning with

12  "an intent to intimidate a person or group of persons."  *Id.* at 347 (quoting Va. Code Ann. § 18.2-

13  423 (1996)).  The Supreme Court held that a state could proscribe cross burning carried out with

14  the intent to intimidate, but that it was unconstitutional to treat any cross burning as prima facie

15  evidence of such intent.  *Id.* at 347-48.

16         Petitioner maintains that the Washington Supreme Court's decision on his as-applied

17  challenge was contrary to *Black*.  (Dkt. 125 at 30.)  Petitioner argues that the court correctly

18  identified *Black* as the clearly established law relevant to his claim but reached a decision

19  contrary to *Black* because it "mischaracterized [. . .] the appropriate rule."  (Dkt. 125 at 31

20  (quoting *Williams*, 529 U.S. at 397, alteration added by court).)  According to petitioner, *Black*

21  requires a "true threat," meaning a "serious expression of an intent to commit an act of unlawful

22  violence to a particular individual or group of individuals," 538 U.S. at 359, while the

23  Washington Supreme Court affirmed his conviction based on a "'serious expression' of intent to

REPORT AND RECOMMENDATION - 16

1  subject his former wife to ridicule through publicizing the videos" (Dkt. 125-10 at 2).  (Dkt. 125

2  at 31.)  Petitioner thus asserts that the Washington Supreme Court changed the standard for when

3  speech may be constitutionally proscribed.  (*Id.* (citing *Benn v. Lambert*, 283 F.3d 1040, 1051

4  n.5 (9th Cir. 2012) (citing *Williams* for the proposition that "[t]he addition, deletion, or alteration

5  of a factor in a test established by the Supreme Court also constitutes a failure to apply

6  controlling Supreme Court law under the 'contrary to' clause of AEDPA")).)

7        Respondent counters that the Washington Supreme Court's decision cannot be contrary

8  to *Black* because *Black* is not a controlling precedent given that it involved a cross burning

9  statute.  (Dkt. 133 at 53.)  Respondent emphasizes that the Supreme Court has never explicitly

10 prohibited regulation of non-bodily threat intimidation against public officials intended to make

11 the officials change their decisions.  (*Id.* at 47, 52-53.)  Respondent argues that *Black* never

12 purported to regulate every statute prohibiting threats or to provide an all-encompassing list of

13 the types of speech that a state can criminalize.  (*Id.* at 53.)  Respondent points out that *Black*'s

14 discussion of the constitutionally proscribable categories of speech begins, "Thus, for example,"

15 538 U.S. at 359, thereby indicating that the list was non-exhaustive.  (Dkt. 133 at 53.)

16 Respondent further contends that *Stevens* is distinguishable for the same reasons as *Black*—it did

17 not involve the issue of whether states can criminalize a threat of non-bodily injury used to

18 influence a public official's decision, the Supreme Court never purported to create an all-

19 encompassing list of proscribable speech, and it left open the possibility that "maybe there are

20 some categories of speech that have been historically unprotected but have not yet been

21 specifically identified or discussed as such" by the Supreme Court.  (*Id.* at 54 n.10 (quoting

22 *Stevens*, 559 U.S. at 472).)

23

1    In reply, petitioner argues that relief under § 2254(d)(1)'s "contrary to" clause does not

2    require an identical factual scenario when the state court applies a *rule* that contradicts governing

3    Supreme Court law.  (Dkt. 136 at 9.)  Here, petitioner contends, the Washington Supreme Court

4    impermissibly altered the definition of a true threat set forth in *Black*.  Petitioner further argues

5    that to the extent the Washington Supreme Court created a new category of proscribable speech,

6    that holding would be contrary to *Stevens*.  (*Id.* at 11.)

7    The Court agrees with petitioner that the Washington Supreme Court's decision is

8    contrary to clearly established Supreme Court precedent.  Citing *Black*, the Washington Supreme

9    Court approved of the criminalization of speech that does not meet *Black*'s definition of a true

10   threat.  Although, as respondent points out, the Supreme Court has not considered whether non-

11   bodily threat intimidation against public officials that is intended to make the officials change

12   their decisions could be recognized as a new category of proscribable speech, the Supreme Court

13   has held that "new categories of unprotected speech may not be added to the list [of proscribable

14   categories of speech] by a legislature that concludes certain speech is too harmful to be

15   tolerated."  *Brown*, 564 U.S. at 791 (citing *Stevens*).  As noted above, "Before exempting a

16   category of speech from the normal prohibition on content-based restrictions . . . the Court must

17   be presented with 'persuasive evidence that a novel restriction on content is part of a long (if

18   heretofore unrecognized) tradition of proscription.'"  *Alvarez*, 567 U.S. at 722 (quoting *Brown*,

19   564 U.S. at 792 (citing *Stevens*)).  Neither party presented such evidence to the Washington

20   Supreme Court, nor did the court recognize the restriction as part of a long tradition of

21   proscription.  Accordingly, the Washington Supreme Court did not apply the proper test as set

22   forth by the Supreme Court, and its decision is contrary to *Stevens*, *Brown*, and *Alvarez*.

23

REPORT AND RECOMMENDATION - 18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

6.    *De Novo Review of Petitioner's As-Applied Claim*

Because petitioner has satisfied § 2254(d)(1)'s "contrary to" clause, the Court reviews his claim de novo.  *See Lafler v. Cooper*, 566 U.S. 156, 173-74 (2012) (reviewing habeas petitioner's ineffective assistance claim de novo after finding that state court's adjudication of the claim was "contrary to" clearly established federal law); *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (holding that, when the requirement set forth in § 2254(d)(1) is satisfied, "[a] federal court must then resolve the claim without the deference AEDPA otherwise requires"). Under de novo review, the Court is not limited to the Supreme Court's clearly established law. *See Panetti*, 551 U.S. at 953.

To determine the merits of petitioner's as-applied claim, the Court must decide (1) whether petitioner's threats amount to protected or unprotected speech under the First Amendment, and (2) if the speech is protected, whether the State properly proscribed it.  As discussed below, the Court concludes that petitioner engaged in protected speech and that the State's regulation of that speech does not survive strict scrutiny.  Therefore, petitioner is entitled to habeas relief on SAP Ground 1.

a.    *Petitioner Engaged in Protected Speech*

Counts I and II were based on petitioner's attempt to have Ms. Hallmark and Mr. Richey change official actions by threatening file a law suit against Ms. Hallmark, pursue a bar complaint against Mr. Richey, and release pornographic videos of Ms. Gray.  Petitioner argues that he engaged in protected speech because he did not make a true threat of bodily harm or death, as defined in *Black*.  (Dkt. 144 at 2.)  Respondent does not dispute that petitioner did not make a true threat.  Respondent also does not assert that petitioner's speech falls into any of the other categories of unprotected speech that the Supreme Court has identified.  Instead,

REPORT AND RECOMMENDATION - 19

respondent argues that petitioner made an inherently wrongful threat, as defined in *State v. Pauling*, 149 Wash.2d 381 (2003), and therefore his speech was unprotected. (Dkt. 143 at 8, 16-18.) Respondent further contends that the Court should recognize the category of speech at issue here—wrongful threats used to intimidate a public servant—as historically unprotected, even though there is no Supreme Court precedent identifying it as such. (*Id.* at 22-23.)

In *Pauling*, the defendant was convicted of second degree extortion under former RCW 9A.56.130 (1975). The statute provided, "'Extortion,' means knowingly to obtain or attempt to obtain by threat property or services of the owner, and specifically includes sexual favors," and, "A person is guilty of extortion in the second degree if he commits extortion by means of a threat as defined in RCW 9A.04.110(25)(d) through (j)."[7] *Pauling*, 149 Wash.2d at 387 (quoting RCW 9A.56.110; RCW 9A.56.130(1) (1975)). On the defendant's First Amendment facial challenge, the Washington Supreme Court held that the former second degree extortion statute prohibited "a real and substantial amount of protected speech that the government may not infringe upon," but was amenable to a limiting construction. *Id.* at 389, 391. The court relied on the Second Circuit's decision in *United States v. Jackson*, 180 F.3d 55 (2d Cir. 1999), which interpreted the federal extortion statute to require that a threat be inherently wrongful. *Pauling*, 149 Wash.2d at 390. The Second Circuit explained that a threat is inherently wrongful "where a threat of harm to a person's reputation seeks money or property to which the threatener does not have, and cannot reasonably believe she has, a claim or right, *or where the threat has no nexus to a plausible claim of right* . . . ." *Pauling*, 149 Wash.2d at 390 (quoting *Jackson*, 180 F.3d at 71, emphasis added in *Pauling*). The Washington Supreme Court explained:

> Although a person might have a legal right to collect a judgment, there is no
> nexus between the exercise of that right and the threat to post embarrassing nude

---

[7] The threat definitions referenced in former RCW 9A.56.130(1) are now codified at RCW 9A.04.110(28) and include subjections (e), (f), and (j), which were included in petitioner's jury instructions for Counts I and III.

photos on the Internet.  On the other hand, a person with a legal right to collect a
judgment would have a nexus to a threat to institute garnishment proceedings.

*Id.*  The court thus limited the former second degree extortion statute to require "that there be a
'lack of nexus' that limits its application to only unprotected speech."  *Id.* at 391.

Respondent contends that petitioner's threats to release pornographic videos of Ms. Gray
have no nexus to the actions petitioner attempted to elicit from Ms. Hallmark and Mr. Richey,
and therefore they are inherently wrongful and not constitutionally protected.  (Dkt. 143 at 18.)
Respondent points out that the courts in *Pauling* and *Jackson*, *inter alia*, upheld convictions for
threats that were not "true threats," namely threats to send nude photographs to the victim's
family and friends unless she paid off a valid judgement the defendant had against her, *Pauling*,
149 Wash.2d at 391-92, and threats to go to newspapers with embarrassing and damaging
information about the victim unless the victim paid the defendant money, *Jackson*, 180 F.3d at
62-63.  (Dkt. 143 at 19.)  Respondent contends that like extortion statutes, the intimidating a
public servant statute, RCW 9A.76.180, is designed to protect public officials from extortion-like
behavior when it relates to their official duties.  (*Id.*)

Petitioner directs the Court's attention to the Court of Appeals' recent decision in *State v.
Dawley*, 455 P.3d 205 (Wash. Ct. App. 2019), another case addressing a facial First Amendment
challenge.  (Dkt. 145 at 2.)  In *Dawley*, the defendant was convicted of violating the intimidating
a public servant statute with a threat as defined in RCW 9A.04.110(28)(j) ("a direct or indirect
communication with the intent . . . [t]o do any other act which is intended to harm substantially
the person threatened or another with respect to his or her health, safety, business, financial
condition, or personal relationships").  *Dawley*, 455 P.3d at 212.  The Court of Appeals held that
"the statutory definition of 'threat' in section RCW 9A.04.110(28)(j) goes beyond true threats
and sweeps up a substantial amount of protected speech, including political speech at the core of

First Amendment protection," and therefore "the intimidating a public servant statute, when based on RCW 9A.04.110(28)(j), is unconstitutionally overbroad." *Id.* at 215. The court adopted the defendant's proposal to limit the statute to true threats and rejected the State's proposal of the "inherently wrongful" limitation from *Pauling*. *Id.* The court explained that the crime of extortion at issue in *Pauling* is "fundamentally different from the crime of intimidating a public servant." *Id.* Specifically, the court reasoned that extortion is an extension of theft and is a mixed conduct and speech crime, unlike intimidating a public servant, which regulates pure speech. *Id.* at 216. The court further explained:

> Unlike *Pauling* and the second degree extortion statute, an "inherently wrongful" limitation would not limit RCW 9A.76.180 to "only unprotected speech." No matter the motive behind an individual's attempt to influence a public servant's vote, opinion, decision, or other official action as a public servant, such pure political speech is at the core of the First Amendment and necessarily subject to heightened protection.

*Id.* (footnotes omitted). Because the defendant did not make a true threat, the court reversed his convictions for intimidating a public servant. *Id.*

Petitioner also cites *Harrell v. State*, 297 Ga. 884 (2015), in which the Georgia Supreme Court reversed the defendant's convictions for endeavoring to intimidate a court officer by threatening to post a pornographic video of a deputy chief clerk if a bench warrant against him was not lifted. *Id.* at 884. The Georgia Supreme Court held that the statute was unconstitutional as applied to the defendant because his speech did not amount to a true threat and therefore was not proscribable. *Id.* at 888.

The Court is not persuaded by respondent's contention that *Pauling* and other authority addressing extortion can be applied to the intimidating a public servant statute. No Washington court has applied *Pauling*'s limiting construction to the intimidating a public servant statute or to any of the other statutes that incorporate RCW 9A.04.110(28)'s threat definitions. The only case

1   that has considered the issue, *Dawley*, declined to apply *Pauling* because "the crime of extortion

2   is fundamentally different from the crime of intimidating a public servant."  455 P.3d at 215.

3   Respondent offers no persuasive rebuttal to this conclusion or *Dawley*'s reasoning.  (*See* Dkt.

4   147 at 6-7 (asserting without explanation that *Dawley*'s analysis was not "sound").)  Respondent

5   also fails to cite any case holding that intimidating a public servant by a wrongful threat is

6   unprotected.  The most analogous case cited by the parties, *Harrell*, held that threats similar to

7   those petitioner made here were protected under the First Amendment.  297 Ga. at 888.

8        Respondent also asks the Court to find that "intimidation of public servants by wrongful

9   threats" is a category of unprotected speech.  (Dkt. 143 at 22.)  As noted previously, the Supreme

10   Court has recognized that there may be "some categories of speech that have been historically

11   unprotected, but have not yet been specifically identified or discussed as such in our case law."

12   *Stevens*, 559 U.S. at 472.  "Before exempting a category of speech from the normal prohibition

13   on content-based restrictions, however, the Court must be presented with 'persuasive evidence

14   that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of

15   proscription.'"  *Alvarez*, 567 U.S. at 722 (quoting *Brown*, 564 U.S. at 792).  The Supreme Court

16   has not set forth a specific test for determining when a new category of unprotected speech

17   should be recognized, and the Court is not aware of any cases recognizing a new category of

18   speech since *Stevens* rejected an "ad hoc balancing of relative social costs and benefits."  559

19   U.S. at 470.

20        Respondent argues that intimidation of public servants by wrongful threats has a

21   "considerable historical pedigree."  (Dkt. 143 at 22.)  Citing Black's Law Dictionary, respondent

22   asserts that intimidation is a form of extortion.  (*Id.*)  According to respondent, extortion or

23   blackmail involving wrongful threats have been outlawed in both Britain and the United States

1    since at least the late 18th century.  (*Id.* (citing James Lindgren, *Unraveling the Paradox of*

2    *Blackmail*, 84 Colum. L. Rev. 670, 674 (1984)).)  Respondent contends that the earliest

3    blackmail and public intimidation statutes in Washington date back to at least 1909 and were

4    based on older codes from New York and Minnesota.  (*Id.* at 22-23 (citing 1909 Wash. Sess.

5    Laws at 890 ("The Criminal Code was taken largely from New York and Minnesota."), 924

6    ("intimidation of public officer"), 1000-01 (extortion), 1002 (blackmail)).)  Respondent also cites

7    to Representative Hobbs' statements to Congress in 1945 that "everybody" knows what the

8    terms extortion and robbery mean; according to respondent, novel categories of unprotected

9    speech cannot be described in this way.  (*Id.* at 23 (quoting *Jackson*, 180 F.3d at 69).)

10       Respondent has not presented persuasive evidence sufficient to recognize intimidation of

11   public servants by wrongful threats as a new category of unprotected speech.  As *Dawley*

12   explained, extortion and intimidating a public servant are fundamentally different crimes, and

13   therefore the Court declines to find that caselaw and statutes discussing extortion are controlling

14   in this case.  Furthermore, respondent's historical evidence of intimidation of public servants by

15   wrongful threats is limited to one Washington statute, which did not reference wrongful threats.

16   *See* 1909 Wash. Sess. Laws at 924.[8]  Given that respondent is asking the Court to recognize a

17   class of speech under the First Amendment—which applies to all the states—the Court finds this

18   evidence insufficient.

19       Because petitioner's threats do not fall into a category of unprotected speech recognized

20   by the Supreme Court, and because respondent has not presented sufficient evidence to justify

21

22

23

---

[8] The statute provided:  "Every person who shall, directly or indirectly, address any threat or intimidation to a public officer . . . with intent to induce him, contrary to his duty to do or make or to omit or delay any act, decision or determination, shall be guilty of a misdemeanor."  1909 Wash. Sess. Laws at 924.

REPORT AND RECOMMENDATION - 24

1    recognizing a new category of unprotected speech, the Court concludes that petitioner engaged in

2    protected speech.

3              b.       *Whether the State Properly Regulated Petitioner's Protected Speech*

4              The Court's conclusion that petitioner engaged in protected speech does not end the

5    analysis of his as-applied claim.  The next question is whether the state lawfully regulated his

6    speech.  Petitioner argues that under *United States v. Bagdasarian*, 652 F.3d 1113 (9th Cir.

7    2011), the State can only regulate true threats as defined in *Black*.  (Dkt. 144 at 2.)  Alternatively,

8    he contends that the Court should apply strict scrutiny.  (*Id.* at 2-3.)  Respondent counters that

9    strict scrutiny is inappropriate to analyze petitioner's as-applied claim and that the Court should

10   apply the overbreadth analysis articulated in *Stevens*.  (Dkt. 143 at 5-23.)  The Court discusses

11   each issue below, ultimately concluding that the regulation of speech should be reviewed under

12   strict scrutiny and that the State cannot survive this test.[9]

13             i.       *Bagdasarian*

14             Petitioner argues that because he did not make a true threat, the Court should conclude

15   that the intimidating a public servant statute was unconstitutional as applied to him.  According

16   to petitioner, under the Ninth Circuit's construction of *Black* in *Bagdasarian*, "Statutes that

17   regulate pure speech in the form of a threat, as Washington's intimidating a public servant statute

18   does, can regulate only true threats of bodily harm or death."  (Dkt. 136 at 15.)  Petitioner

19   maintains that because the jury was instructed on an overbroad definition of "threat" and the

20   evidence before the jury did not establish a threat of bodily harm or death, the Court must vacate

21   his intimidation convictions.  (Dkt. 125 at 39.)  *Bagdasarian* involved 18 U.S.C. § 879(a)(3),

22   which makes it a crime to "knowingly and willfully threaten[ ] to kill, kidnap, or inflict bodily

23

---

[9] Given this conclusion, the Court does not discuss petitioner's facial challenge to the intimidating a public servant statute.

REPORT AND RECOMMENDATION - 25

1   harm upon . . . a major candidate for the office of President or Vice President, or a member of the

2   immediate family of such candidate." *Bagdasarian*, 652 F.3d at 1116 (quoting § 879(a)(3),

3   alterations in *Bagdasarian*).  The court noted that in *Black*, the Supreme Court held "that under

4   the First Amendment the State can punish threatening expression, but only if the 'speaker means

5   to communicate a serious expression of an intent to commit an act of unlawful violence to a

6   particular individual or group of individuals.'" *Bagdasarian*, 652 F.3d at 1116 (quoting *Black*,

7   538 U.S. at 359).  The court went on to consider "whether a subjective or objective analysis is

8   required when examining whether a threat is criminal under various threat statutes and the First

9   Amendment."[10]  *Id.* at 1116-117.  The court held,

> In order to affirm a conviction under any threat statute that criminalizes pure speech, we must find sufficient evidence that the speech at issue constitutes a "true threat," as defined in *Black*.  Because the true threat requirement is imposed by the Constitution, the subjective test set forth in *Black* must be read into all threat statutes that criminalize pure speech.  The difference is that with respect to some threat statutes, we require that the purported threat meet an objective standard in addition, and for some we do not.

14   *Id.* at 1117.

15      The Court does not agree with petitioner that *Bagdasarian* directly controls this case.

16   The statutes that the Ninth Circuit identified as "threat statutes" are distinguishable from

17   Washington's intimidating a public servant statute.  Those statutes expressly prohibit making

18   true threats.  Thus, any statement that does not constitute a true threat cannot support a

19   conviction under the terms of the statute.  Washington's intimidating a public servant statute has

20   a different scope.  It requires that the offender attempt to "influence a public servant's vote,

21

22   ────────────────────

23   [10] In addition to § 879(a)(3), the court identified 18 U.S.C. §§ 871(a) and 875(c) as "threat statutes." *Bagdasarian*, 652 F.3d at 1117, 1117 n.11.  Section 871(a) prohibits "knowingly and willfully threaten[ing] to kill, kidnap, or inflict bodily harm" upon specified individuals, including former Presidents and their immediate family members. Section 875(c) prohibits transmitting "in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another . . . ."

1   opinion, decision, or other official action as a public servant." RCW 9A.76.180(1). It also has a

2   broader definition of "threat" that includes actions that do not amount to true threats within the

3   meaning of *Black*. Given that *Bagdasarian* did not construe a statute with a similar scope as the

4   one at issue in this case, the Court declines to find its discussion binding here.

ii.    *Strict Scrutiny*

6          The parties next dispute whether the Court should apply strict scrutiny or overbreadth

7   analysis. Respondent argues that the Court should review the intimidating a public servant

8   statute for overbreadth because the statute regulates both protected and unprotected speech.

9   (Dkt. 143 at 6-13.) Overbreadth analysis, however, applies to facial challenges, not as-applied

10  challenges. *See, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) ("[T]he overbreadth

11  doctrine permits the *facial* invalidation of laws that inhibit the exercise of First Amendment

12  rights if the impermissible applications of the law are substantial when judged in relation to the

13  statute's plainly legitimate sweep.") (internal quotation omitted, emphasis added). Because the

14  Court has concluded that petitioner engaged in protected speech, and because the intimidating a

15  public servant statute regulates speech based on its content, the Court agrees with petitioner that

16  strict scrutiny the appropriate analytical framework to determine whether the statute properly

17  prohibited his speech.[11] *See, e.g.*, *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1665 (2015)

18  (holding that a State may restrict the speech of a judicial candidate only if the restriction is

19  narrowly tailored to serve a compelling interest); *Alvarez*, 567 U.S. at 724-25 (declining to

---

[11] The Court is not persuaded by respondent's argument that it cannot consider strict scrutiny because petitioner failed to properly exhaust this claim. (Dkt. 143 at 5-6.) To properly exhaust a claim, "It has to be clear from the petition filed at each level in the state court system that the petitioner is claiming the violation of the federal constitution that the petitioner subsequently claims in the federal habeas petition." *Galvan v. Alaska Dep't of Corrections*, 397 F.3d 1198, 1204 (9th Cir. 2005). Petitioner properly raised his as-applied and facial First Amendment claims in the Washington Supreme Court. Contrary to respondent's suggestion, strict scrutiny is not a federal constitutional claim; it is a method of *analyzing* a federal constitutional claim. Respondent does not cite any authority limiting the Court's de novo review to the specific arguments petitioner made in his opening brief to the state courts. Accordingly, the Court is free to apply strict scrutiny analysis as appropriate.

REPORT AND RECOMMENDATION - 27

1    recognize a new category of proscribable speech and assessing whether the criminal statute's

2    content-based restrictions on protected speech could survive the "most exacting scrutiny," which

3    involved compelling governmental interests and restrictions on speech that are "actually

4    necessary" to achieve these interests); *Brown*, 564 U.S. at 799 (declining to recognize a new

5    category of proscribable speech and applying strict scrutiny to determine whether the restriction

6    on the content of protected speech was invalid); *Holder v. Humanitarian Law Project*, 561 U.S.

7    1, 28, 36 (2010) (on as-applied challenge, holding that government adequately substantiated its

8    determination that statute's proscription on protected speech was "necessary" to "serve an urgent

9    objective of the highest order").   Under this test, the State bears the burden of demonstrating that

10    the regulation is "justified by a compelling government interest and is narrowly drawn to serve

11    that interest."  *Brown*, 564 U.S. at 799.  "The State must specifically identify an 'actual problem'

12    in need of solving, and the curtailment of free speech must be actually necessary to the solution."

13    *Id.* (internal quotation omitted).  "That is a demanding standard.  It is rare that a regulation

14    restricting speech because of its content will ever be permissible."  *Id.* (internal quotation

15    omitted).

16    Respondent argues the intimidating a public servant statute serves a compelling

17    governmental interest in protecting the fairness and transparency of, and the public's access to,

18    official decision-making processes.  (Dkt. 143 at 27.)  Respondent relies on *State v. Stephenson*,

19    89 Wash. App. 794 (1998), in which Division 2 of the Court of Appeals rejected the defendant's

20    contention that the intimidating a public servant statute was unconstitutionally overbroad.  In

21    doing so, the Court of Appeals identified the following compelling governmental interests served

22    by the statute:  protecting "public servants from threats of substantial harm based upon the

23    discharge of their official duties," protecting "the public's interest in a fair and independent

REPORT AND RECOMMENDATION - 28

1   decision-making process consistent with the public interest and the law," and helping maintain

2   public confidence in democratic institutions "by deterring the intimidation and threats that lead

3   to corrupt decision making." *Id.* at 803-04. Division 1 of the Court of Appeals recently agreed

4   that these interests are compelling. *Dawley*, 455 P.3d at 213.

5          Respondent further argues that the intimidating a public servant statute is narrowly

6   tailored to achieve these compelling interests. (Dkt. 143 at 28-29.) This contention is based on

7   respondent's position that the statute is limited by *Pauling* to inherently wrongful threats where

8   there is no legitimate nexus between the threat and the goal the threatener is trying to achieve.

9   (*Id.*) Thus, according to respondent, the statute only proscribes threats that are unprotected. (*Id.*)

10  As discussed above, however, no Washington court has applied *Pauling*'s limiting construction

11  to the intimidating a public servant statute, and the Court of Appeals in *Dawley* expressly

12  declined to do so when considering a facial attack to the statute. Also as discussed above, the

13  statute proscribes more than unprotected speech. Given these conclusions, respondent fails to

14  show that the intimidating a public servant statute is narrowly drawn to actually remedy the

15  identified governmental interests.[12] Accordingly, the statute is unconstitutional as applied to

16  Counts I and III, and these convictions should be vacated. Habeas relief should be granted as to

17  SAP Ground 1, and petitioner should be released unless the State resentences him on the

18  remaining counts within 30 days of the order on this Report and Recommendation.

19  B.     SAP Ground 7 – Insufficient Evidence to Sustain Conviction for Stalking

20         The parties dispute whether petitioner properly exhausted SAP Ground 7, and if he did

21  not, whether he can overcome the procedural default. The Court concludes that petitioner did

22  not properly exhaust SAP Ground 7 and that this claim is procedurally defaulted.

23

---

[12] Because the Court reaches this conclusion, it need not address petitioner's specific arguments as to why the statute does not survive strict scrutiny.

REPORT AND RECOMMENDATION - 29

1          1.      *Legal Standards for Exhaustion*

2          Before seeking federal habeas relief, a state prisoner must exhaust the remedies available

3   in the state courts.  The exhaustion requirement reflects a policy of federal-state comity, intended

4   to afford the state courts "an initial opportunity to pass upon and correct alleged violations of its

5   prisoners' federal rights."  *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal citation

6   quotation marks omitted).

7          There are two avenues by which a petitioner can satisfy the exhaustion requirement.

8   First, a petitioner can properly exhaust his state remedies by "fairly presenting" his claim in each

9   appropriate state court, including the state supreme court with powers of discretionary review,

10  thereby giving those courts the opportunity to act on his claim.  *Baldwin v. Reese*, 541 U.S. 27,

11  29 (2004); *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995).  "It has to be clear from the petition

12  filed at each level in the state court system that the petitioner is claiming the violation of the

13  federal constitution that the petitioner subsequently claims in the federal habeas petition."

14  *Galvan v. Alaska Dep't of Corrections*, 397 F.3d 1198, 1204 (9th Cir. 2005).

15         Second, a petitioner may technically exhaust his state remedies by demonstrating that his

16  "claims are now procedurally barred under [state] law."  *Gray v. Netherland*, 518 U.S. 152, 162-

17  63 (1996) (quoting *Castille v. Peoples*, 489 U.S. 436, 351 (1989)); *see also Smith v. Baldwin*,

18  510 F.3d 1127, 1139 (9th Cir. 2007) (en banc).  If the petitioner is procedurally barred from

19  presenting his federal claims to the appropriate state court at the time he files his federal habeas

20  petition, the claims are deemed to be procedurally defaulted for purposes of federal habeas

21  review.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).  A habeas petitioner who has

22  defaulted his federal claims in state court meets the technical requirements for exhaustion

23  because "there are no state remedies any longer 'available' to him."  *Coleman v. Thompson*, 501

REPORT AND RECOMMENDATION - 30

1    U.S. 722, 732 (2007). Federal habeas review of procedurally defaulted claims is barred unless

2    the petitioner can either demonstrate cause for the default and actual prejudice as a result of the

3    alleged violation of federal law, or demonstrate that failure to consider the claims will result in a

4    fundamental miscarriage of justice. *Id.* at 724.

5             2.    *Proper Exhaustion*

6            In his SAP, petitioner did not address whether he properly exhausted SAP Ground 7.

7    (Dkt. 125 at 58-59.) Respondent noted this omission in the answer. (Dkt. 133 at 43.) In reply,

8    petitioner pointed to his *pro se* pleading entitled "Discretionary Review by Supreme Court" (Dkt.

9    125-8 at 144-64), which was transferred from the Court of Appeals to the Washington Supreme

10    Court on April 10, 2013, as a petition for review (hereinafter, "First PRV"). (Dkt. 136 at 30.) In

11    the First PRV, petitioner argued that his case was similar to *Nali v. Phillips*, 630 F. Supp. 2d 807

12    (E.D. Mich. 2009), and would "not withstand Federal scrutiny." (Dkt. 125-8 at 156.) In *Nali*,

13    the court discussed the federal standard for sufficiency of the evidence, citing relevant Supreme

14    Court precedent. 630 F. Supp. 2d at 816-17. Therefore, petitioner presented this claim as a

15    violation of the U.S. Constitution. *See Lyons v. Crawford*, 232 F.3d 666, 670 (9th Cir. 2000)

16    (citation to relevant federal case law sufficient to federalize a claim in the state courts).

17            Respondent argues, however, that the First PRV was not properly before the Washington

18    Supreme Court. (Dkt. 133 at 36, 39 n.5.) Resolution of this issue requires close consideration of

19    the relevant state court filings. Petitioner signed the First PRV on March 18, 2013. On April 4,

20    2013, he signed a motion asking to rewrite the First PRV and to exceed the page limit; the

21    motion was filed in the Washington Supreme Court on April 10, 2013, the same day as the First

22    PRV. (Dkt. 125-8 at 167-76.) On April 12, 2013, the Washington Supreme Court sent a letter to

23    the parties granting petitioner until May 13, 2013, to file a revised petition for review and

1    deferring ruling on the request to file an overlength petition until it had received and reviewed

2    the revised petition.  (Dkt. 125-9 at 1-2.)

3        On April 17, 2013, petitioner signed a "Motion for Discretionary Review by Supreme

4    Court," which was filed in the Washington Supreme Court on April 24, 2013, as the operative

5    petition for review ("Second PRV").  (Dkt. 125-9 at 6-18; *see also* Dkt. 125-8 at 144 (first page

6    of First PRV, which has a handwritten notation, "*replaced by PRV filed 8/24/13"[13]).)  The

7    Second PRV referenced the same Court of Appeals case number as the First PRV and attached

8    the Court of Appeals' opinion as an exhibit (Dkt. 125-9 at 6, 26-42), but it addressed completely

9    different issues, requesting an evidentiary hearing and seeking the return of property that

10   petitioner alleged was illegally seized (*id.* at 6-18).  It did not challenge his convictions.

11       Petitioner subsequently filed a "Motion for Reconsideration/Motion to Modify Ruling of

12   April 12, 2013," asking for permission to file a 50-page petition for review; he was concerned

13   that if he filed an overlength petition prior to obtaining leave of the court, the court would deny

14   his request and refuse to allow him to file another petition that comported with the page limit.

15   (Dkt. 125-9 at 47-54.)  On April 25, 2013, the Washington Supreme Court denied petitioner's

16   request to file a 50-page brief because he had already filed a petition for review that did not

17   exceed the 20-page limit (the Second PRV) and because 20 pages would be sufficient to respond

18   to the Court of Appeals' 17-page opinion.  (Dkt. 125-9 at 44-45.)

19       On May 6, 2013, the State filed an answer to the Second PRV, arguing that the petition

20   did not challenge the Court of Appeals' opinion and therefore should be denied.  (Dkt. 125-9 at

21   57-64.)  On May 15, 2013, petitioner filed a "Motion to Correct the Record on Appeal Issues

22   Before the Court, in Response to State's Answer to Petition."  (*Id.* at 88-93.)  Petitioner argued

23

---

[13] It appears the date "8/24/13" was in error and that the reference is to the petition for review filed on April 24, 2013.

1    that the First PRV was the operative petition for review of his criminal convictions, not the

2    Second PRV.  (*See id.* at 89.)  Petitioner then went on to argue several of the issues he raised in

3    the First PRV, but not the sufficiency of the evidence to support the stalking conviction.  (*See id.*

4    at 90-93.)  On May 22, 2013, petitioner filed a letter regarding "Improper use of 'Threat'

5    Definition," "Gross Prosecutorial Misconduct," and "Supplementing the Record with the Truth."

6    (*Id.* at 94-102.)  Again, he discussed several issues raised in his First PRV but not the sufficiency

7    of the evidence of stalking.  (*See id.*)  On August 5, 2013, the Washington Supreme Court

8    ordered: "[T]he Petition for Review is denied.  The motion to supplement the record and the

9    motion to correct the record are also denied."  (*Id.* at 105.)

10          Respondent argues that petitioner cannot rely on the First PRV for purposes of

11   exhaustion because the Washington Supreme Court never reviewed it, faulting petitioner for

12   requesting and obtaining leave to rewrite the First PRV and then filing the Second PRV

13   addressing different issues.  (Dkt. 133 at 36.)  Petitioner responds that the Washington Supreme

14   Court is responsible for the misunderstanding regarding the operative petition for review.  (Dkt.

15   125 at 21-23; Dkt. 136 at 19, 30.)  According to petitioner, the Second PRV was "clearly" an

16   attempt to have the Washington Supreme Court review the Supreme Court Commissioner's April

17   18, 2012 Ruling Denying Review of a motion for discretionary review petitioner had filed

18   seeking the return of property.  (Dkt. 125 at 22 (citing Dkt. 125-7 at 101-102).)  Petitioner also

19   points out that he promptly attempted to correct the Washington Supreme Court's error by filing

20   his motions to correct and supplement the record.  (Dkt. 136 at 19.)  According to petitioner, the

21   Court should take into account the Supreme Court's admonition that "the complete exhaustion

22   rule is not to trap the unwary *pro se* prisoner," *Slack v. McDaniel*, 529 U.S. 473, 487 (2000)

23   (internal quotation marks omitted), and the Ninth Circuit's permission to read counseled

REPORT AND RECOMMENDATION - 33

1   petitions differently from *pro se* petitions, when appropriate, *Peterson v. Lampert*, 319 F.3d

2   1153, 1159 (9th Cir. 2003) (en banc).  (Dkt. 136 at 19.)

3          Given petitioner's motions to clarify and supplement the record, it is apparent he did not

4   intend the Second PRV to replace the First PRV.  Nevertheless, the Court is not persuaded by his

5   attempts to blame the Washington Supreme Court for improperly filing the Second PRV in the

6   first place.  Petitioner filed the First PRV along with a request to rewrite it.  After the

7   Washington Supreme Court granted his request to rewrite, he filed the Second PRV.  The caption

8   of the Second PRV referenced the same Court of Appeals case number as the First PRV and

9   attached the Court of Appeals' decision.  Even if the Second PRV was an attempt to obtain

10  review of the Commissioner's April 18, 2012 Ruling Denying Review, its caption did not

11  include the appropriate Washington Supreme Court case number or attach a copy of the Ruling

12  Denying Review.  Moreover, petitioner filed the Second PRV *one year* after the Ruling Denying

13  Review, and any motion to modify was due 30 days after the ruling was filed.  *See* Wash. RAP

14  17.7(a).  Thus, it was reasonable for the Washington Supreme Court to construe the Second PRV

15  as petitioner's operative petition.  Petitioner—not the Washington Supreme Court—is

16  responsible for any mistake.

17         To satisfy the proper exhaustion requirement, a federal habeas petitioner must have

18  presented his claim through the "proper vehicle," thereby giving the state court the opportunity

19  to remedy the claimed errors.  *Scott v. Schriro*, 567 F.3d 573, 782-83 (9th Cir. 2009); *see also*

20  *Castille v. Peoples*, 489 U.S. 346, 351 (1989)) (a claim is not fairly presented if it is raised "in a

21  procedural context in which its merits will not be considered" absent special circumstances).  All

22  evidence indicates the Washington Supreme Court did not consider the First PRV.  (*See* Dkt.

23  125-8 at 144 (handwritten note on first page of First PRV stating that it had been "replaced" by

REPORT AND RECOMMENDATION - 34

1  the Second PRV); Dkt. 125-9 at 44 (letter from Washington Supreme Court Clerk denying

2  petitioner's motion to file a 50-page petition for review and noting that he had already filed one

3  that was less than 20 pages, the Second PRV), 57-64 (State's answer addressing only the Second

4  PRV), 105 (Washington Supreme Court order denying Second PRV and motion to correct

5  record).)  The Court thus concludes that the First PRV was not submitted in a procedural context

6  in which the merits would be considered absent special circumstances (i.e., if the court had

7  granted petitioner's motion to correct the record).  Accordingly, petitioner did not properly

8  exhaust SAP Ground 7.

9          3.      *Technical Exhaustion*

10         SAP Ground 7 is technically exhausted and procedurally defaulted because if petitioner

11 attempted to raise the claim in a new personal restraint petition, the state courts would find it

12 barred by Washington law.  Under RCW 10.73.090(1), a petition for collateral attack on a

13 judgment and sentence in a criminal case must be filed within one year after the judgment

14 becomes final, subject to exceptions that do not apply here.  *See* RCW 10.73.100.  A judgment

15 becomes final for purposes of state collateral review on the date the appellate court issues its

16 mandate disposing of a timely direct appeal.  RCW 10.73.090(3)(b).  Here, there is no dispute

17 that the state court issued its mandate well over one year ago.  It therefore appears clear that

18 petitioner would now be time barred from returning to the state courts to present this

19 unexhausted claim.  *See* RCW 10.73.090.  Moreover, because petitioner has previously presented

20 multiple personal restraint petitions to the state courts, the state courts are unlikely to entertain

21 another such petition.  *See* RCW 10.73.140 (successive petition bar).

22

23

REPORT AND RECOMMENDATION - 35

1      4.      *Cause and Prejudice*

2      Federal habeas review of a procedurally defaulted claim is barred unless the petitioner

3  can demonstrate cause and prejudice, or a fundamental miscarriage of justice.  *Coleman*, 501

4  U.S. at 750.  To satisfy the "cause" prong of the cause and prejudice standard, petitioner must

5  show that some objective factor external to the defense prevented him from complying with the

6  state's procedural rule.  *Id.* at 753; *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (a petitioner can

7  demonstrate "cause" if he shows constitutionally ineffective assistance of counsel, the

8  unavailability of a factual or legal basis for a claim, or some interference by officials).  To show

9  "prejudice," petitioner "must shoulder the burden of showing, not merely that the errors at his

10 trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial

11 disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v.*

12 *Frady*, 456 U.S. 152, 170 (1982) (emphases in original); *see also Cavanaugh v. Kincheloe*, 877

13 F.2d 1443, 1448 (9th Cir. 1989) (court need not consider prejudice unless a petitioner meets his

14 burden of demonstrating cause for the procedural default).  And in a "truly extraordinary case,"

15 the Court may grant habeas relief without a showing of cause or prejudice to correct a

16 "fundamental miscarriage of justice" where a constitutional violation has resulted in the

17 conviction of a defendant who is actually innocent.  *Schlup v. Delo*, 513 U.S. 298, 338 (1995);

18 *see also Murray v. Carrier*, 477 U.S. 478, 496 (1986).

19      Petitioner argues that cause and prejudice excuse his procedural default of SAP Ground 7

20 based on attorney abandonment and/or "the globally ineffective assistance of his appellate

21 counsel."  (Dkt. 125 at 59; Dkt. 136 at 30.)  The Court discusses each issue in turn.

22

23

1

          a.     *Attorney Abandonment*

2

      Petitioner argues that he has cause for his procedural default because his attorney on

3

direct appeal, Dana Nelson, abandoned him after filing his opening brief in the Court of

4

Appeals.[14] (*See* Dkt. 125 at 53-59; Dkt. 136 at 22-23, 26.) Petitioner points to the fact that Ms.

5

Nelson failed to file a reply in the Court of Appeals, failed to file a motion for discretionary

6

review, and failed to obtain leave from the court to withdraw so that new counsel could be

7

appointed. (Dkt. 125 at 53.) He also points to a September 7, 2011 email from Ms. Nelson to

8

attorneys at her firm stating that she would not speak with petitioner about his concerns about her

9

opening brief (Dkt. 125-11 at 83-84), and an October 20, 2011 email from Ms. Nelson to a

10

partner at her firm with the subject line "A Farewell to Eggum" (*id.* at 100).[15] (Dkt. 136 at 22-

11

23.) He attempts to analogize his case to *Maples v. Thomas*, 565 U.S. 266 (2012). (Dkt. 136 at

12

22-23.)

13

      In *Maples*, the Supreme Court held that there was cause for the petitioner's failure to

14

properly exhaust his state-court remedies where the petitioner's post-conviction attorneys

15

16

[14] Most of the documents petitioner relies on to argue attorney abandonment are not part of the state-court record and are the subject of his motion to supplement the record. (*See* Dkt. 136 at 22 n.6.) As discussed below in section IV.D, this evidence is properly before the Court for purposes of determining cause and prejudice.

17

18

[15] The full record adds important context for the subject line. On August 31, 2011, Ms. Nelson filed a 48-page opening brief in the Court of Appeals; she challenged only petitioner's sentence and did not raise the issues that trial counsel, Andrew Subin, had flagged for her review. (*See* Dkt. 125-5 at 68-122.) Prior to filing the brief, Ms. Nelson had written petitioner numerous lengthy letters and had three 40-minute telephone calls with him. (Dkt. 125-11 at 83-84.) On September 2, 2011, Ms. Nelson sent petitioner a letter explaining the appellate brief she had drafted and why she did not raise certain issues. (*Id.* at 85-88.) On September 7, 2011, petitioner called Ms. Nelson's office and after Ms. Nelson declined to speak with him, he spoke with Eric Broman, a partner at the law firm. (*Id.* at 83-84, 90.) Mr. Broman informed petitioner he could raise Mr. Subin's issues in a *pro se* statement of additional grounds and agreed to email Mr. Subin a copy of the brief Ms. Nelson drafted. (*Id.* at 90.) Mr. Subin, Mr. Broman, and Ms. Nelson exchanged several emails regarding petitioner's case, with Ms. Nelson explaining why she did not raise certain issues. (*Id.* at 89-90, 96, 99.) On October 20, 2011, Ms. Nelson sent Mr. Broman an email with the subject line "A Farewell to Eggum," which stated: "Here is my latest letter addressing his concerns, but also telling him this is probably the last time I will respond in depth regarding the issues he believes I should have raised." (*Id.* at 100.) In addition to addressing the claims she did not raise, the letter informed petitioner that he could raise them in his *pro se* statement of additional grounds. (Dkt. 125-12 at 1-2.)

19

20

21

22

23

REPORT AND RECOMMENDATION - 37

completely abandoned him.  565 U.S. at 271.  The Supreme Court summarized the key facts as

follows:

> Cory R. Maples is an Alabama capital prisoner sentenced to death in 1997 for the
> murder of two individuals. . . .  Maples sought postconviction relief in state court,
> alleging ineffective assistance of counsel and several other trial infirmities.  His
> petition, filed in August 2001, was written by two New York attorneys serving
> *pro bono*, both associated with the same New York-based large law firm.  An
> Alabama attorney, designated as local counsel, moved for the admission of the
> out-of-state counsel pro hac vice.  As understood by New York counsel, local
> counsel would facilitate their appearance, but would undertake no substantive
> involvement in the case.
>
> In the summer of 2002, while Maples' postconviction petition remained pending
> in the Alabama trial court, his New York attorneys left the law firm; their new
> employment disabled them from continuing to represent Maples.  They did not
> inform Maples of their departure and consequent inability to serve as his counsel.
> Nor did they seek the Alabama trial court's leave to withdraw.  Neither they nor
> anyone else moved for the substitution of counsel able to handle Maples' case.
>
> In May 2003, the Alabama trial court denied Maples' petition.  Notices of the
> court's order were posted to the New York attorneys at the address of the law firm
> with which they had been associated.  Those postings were returned, unopened, to
> the trial court clerk, who attempted no further mailing.  With no attorney of record
> in fact acting on Maples' behalf, the time to appeal ran out.

*Id.* at 270-71.  The District and Circuit courts rejected Maples' federal habeas petition because of

his procedural default in state court, i.e., his failure to timely appeal the denial of his

postconviction petition.  *Id.* at 271.  The Supreme Court reversed.  *Id.*

The issue before the Supreme Court was whether Maples had "shown cause to excuse the

missed notice of appeal deadline."  *Id.* at 280.  The Supreme Court explained, "Negligence on

the part of a prisoner's postconviction attorney does not qualify as 'cause[]' [. . .] because the

attorney is the prisoner's agent, and under 'well-settled principles of agency law,' the principal

bears the risk of negligent conduct on the part of his agent."  *Id.* at 280-81 (quoting *Coleman*,

501 U.S. at 753-54)).  The Supreme Court went on, "A markedly different situation is presented,

however, when an attorney abandons his client without notice, *and thereby occasions the*

REPORT AND RECOMMENDATION - 38

1  *default*." *Id.* at 281 (emphasis added).  "[U]nder agency principles, a client cannot be charged

2  with the acts or omissions of an attorney who has abandoned him.  Nor can a client be faulted for

3  failing to act on his own behalf when he lacks reason to believe his attorneys of record, in fact,

4  are not representing him." *Id.* at 283.

5        Applying this law, the Supreme Court concluded that Maples' attorneys had abandoned

6  him.  There was no dispute that the New York attorneys severed their agency relationship with

7  Maples long before the default occurred and failed to move to withdraw, as required by court

8  rule.  *Id.*  In addition, at the time of the default, no other attorney from the New York law firm

9  had entered an appearance on Maples' behalf.  *Id.* at 286.  The Supreme Court further found that

10  local counsel had abandoned Maples.  *Id.* at 287.  Also important to the Supreme Court's

11  decision was that Maples had "no reason to suspect that he lacked counsel able and willing to

12  represent him," and had not received notice that his postconviction petition had been denied.  *Id.*

13  at 288-89.  The Supreme Court explained, "Had counsel of record or the State's attorney

14  informed Maples of his plight before the time to appeal ran out, he could have filed a notice of

15  appeal himself or enlisted the aid of new volunteer attorneys." *Id.* at 289 (footnotes omitted).

16  Ultimately, the Supreme Court concluded that "Maples was disarmed by extraordinary

17  circumstances quite beyond his control," and therefore established cause for his procedural

18  default.  *Id.*

19        *Maples* is readily distinguishable.  First, *Maples* applies only to claims that were

20  procedurally defaulted *as a result of* counsel abandoning the client.  *See Maples*, 565 U.S. at 281.

21  Even assuming Ms. Nelson abandoned petitioner in the middle of his direct appeal, her actions

22  did not prevent him from raising his claims in a timely petition for review or through a properly

23  filed personal restraint petition.  Second, unlike Maples, the record indicates that petitioner was

1    apprised of everything that occurred in his case, either via counsel of record or the Court of

2    Appeals.[16]  Third, given petitioner's voluminous *pro se* filings in the state courts, it is clear that

3    he was under no illusion that Ms. Nelson would file a petition for review on his behalf.  Unlike

4    in *Maples*, petitioner has not shown that extraordinary circumstances beyond his control caused

5    the procedural default that bars this Court from considering SAP Ground 7.  His attorney

6    abandonment claim fails.

7                    b.        *Ineffective Assistance of Appellate Counsel*

8           Petitioner argues that he has cause for the procedural default of SAP Ground 7 because

9    Ms. Nelson provided globally ineffective assistance of counsel by failing to challenge any of his

10   convictions.  (Dkt. 125 at 59 (citing *id.* at 39-37, 52-53); Dkt. 136 at 30-31.)  Attorney error that

11   constitutes constitutionally ineffective assistance of counsel is cause sufficient to overcome a

12   procedural default.  *Coleman*, 501 U.S. at 753-54; *Edwards v. Carpenter*, 529 U.S. 446, 451

13   (2000).  However, for ineffective assistance of counsel to constitute cause, the petitioner must

14   exhaust the ineffective assistance of counsel claim in the state courts.  *Carpenter*, 529 U.S. at

15   452-53.  If the ineffective assistance of counsel claim is itself procedurally defaulted, it cannot be

16   the basis for a cause showing unless the petitioner can establish cause and prejudice with respect

17   to the ineffectiveness claim.  *Id.*

18          Petitioner cites to three documents that he argues exhausted his global ineffective

19   assistance of appellate counsel claim.  (Dkt. 136 at 31.)  First, he cites to his February 12, 2012

20   "Motion for '*Anders* Brief' Ineffective Assistance of Appellate Counsel," filed in the Court of

21   Appeals, which attached Mr. Subin's list of potential issues for appeal, including "legal

22

23

---

[16] For example, on February 15, 2012, the Court of Appeals sent a letter to Ms. Nelson informing her that the court placed petitioner's *pro se* motion regarding ineffective assistance of counsel in the file without taking action.  (Dkt. 125-7 at 70.)  Petitioner subsequently sent a letter to the Court of Appeals objecting to this action.  (*Id.* at 91.)

REPORT AND RECOMMENDATION - 40

1    sufficiency of evidence to support conviction."  (Dkt. 125-7 at 60-69.)  As this document was not

2    filed in the Washington Supreme Court, it did not properly exhaust the claim.  *See Baldwin*, 541

3    U.S. at 29 (proper exhaustion requires presentation to state's highest court).

4         Second, petitioner cites to his March 16, 2012 "Motion for Ineffective Assistance of

5    Counsel and *Anders* Brief," which he filed in both the Court of Appeals and Washington

6    Supreme Court.  (Dkt. 136 at 31; *see also* Dkt. 125-7 at 71-90.)  At the time he filed the motion,

7    his direct appeal was pending before the Court of Appeals, and that court referred the motion to a

8    panel of judges on April 10, 2012.  (Dkt. 125-7 at 99.)  He also had a *pro se* motion for

9    discretionary review pending in the Washington Supreme Court through which he sought the

10   return of property he claimed was illegally seized by the State as a result of an earlier conviction.

11   (*See id.* at 101-02.)  On April 18, 2012, the Washington Supreme Court Commissioner denied

12   the motion for discretionary review, noting in a footnote:

13        Mr. Eggum has also filed motions relating to ineffective assistance of counsel and
          an *Anders* brief.  [Citation omitted.]  These motions seem to be directed to the
14        Court of Appeals, though they were also filed in this court.  In any event, they are
          not pertinent to Mr. Eggum's motion for discretionary review.  A Court of
15        Appeals commissioner has referred the motions to a panel of that court's judges.
          The motions will not be further dealt with here.

16
17   (*Id.* at 102 n. 1.)  According to petitioner, this statement demonstrates that he fairly presented his

18   ineffective assistance claim to the Washington Supreme Court.  (Dkt. 136 at 19.)

19        The Court does not agree.  As noted above, proper exhaustion requires the petitioner to

20   have presented his claim through the "proper vehicle," thereby giving the state court the

21   opportunity to remedy the claimed errors.  *Scott*, 567 F.3d at 782-83; *see also Castille*, 489 U.S.

22   at 351) (a claim is not fairly presented if it is raised "in a procedural context in which its merits

23   will not be considered" absent special circumstances).  Petitioner filed his ineffective assistance

     motion with the Washington Supreme Court while his relevant appeal was pending with the

REPORT AND RECOMMENDATION - 41

1   Court of Appeals, and the high court declined to consider the motion because it had been referred

2   to a panel of the Court of Appeals and because it did not relate to the property claim that was the

3   subject of the motion for discretionary review.  Petitioner thus failed to present his ineffective

4   assistance claim through the "proper vehicle."

5          Petitioner's reliance on *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986), does not require a

6   different conclusion.  (*See* Dkt. 136 at 21.)  Petitioner cites *Vasquez* for the proposition that a

7   presentation that "afforded the state courts [a] meaningful opportunity to consider [the]

8   allegations of error," even if they declined the opportunity, constitutes exhaustion.  474 U.S. at

9   257.  But filing a motion for ineffective assistance of counsel in *both* the Court of Appeals and

10  the Washington Supreme Court at the same time, while the relevant appeal was pending before

11  the Court of Appeals, which had referred the motion to a panel of judges, did not provide the

12  Washington Supreme Court with a "meaningful opportunity" to consider his claims.

13         Finally, petitioner cites to his August 13, 2012 letter to the Court of Appeals and

14  Washington Supreme Court regarding "Objection to 05 September 2012 date being set by the

15  COA to hear this matter prior to the Supreme Court ruling on the appellant's IAAC/Anders Brief

16  motions," which referenced Mr. Subin's list of issues.  (Dkt. 125-7 at 108-11.)  Petitioner,

17  however, does not show how this letter could be considered a "proper vehicle" for purposes of

18  proper exhaustion.  The Court concludes that it was not, and therefore petitioner failed to fairly

19  present and properly exhaust his global ineffective assistance of appellate counsel claim.

20         Because petitioner failed to properly exhaust his global ineffectiveness claim, this claim

21  cannot serve as cause to overcome the procedural default of SAP Ground 7 unless he can show

22  cause and prejudice as to the global ineffectiveness claim.  *Carpenter*, 529 U.S. at 452-53.

23  Petitioner argues that he has cause based on attorney abandonment (Dkt. 136 at 22-23), but as

REPORT AND RECOMMENDATION - 42

1   discussed above, this claim fails.  Petitioner also raises actual innocence to excuse the procedural

2   default.  (*Id.* at 26-29.)  Prisoners asserting actual innocence as a gateway to procedurally

3   defaulted claims must establish that, in light of new evidence, "it is more likely than not that no

4   reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Schlup*, 513

5   U.S. at 327.  Rather than presenting new evidence to the Court regarding his stalking conviction,

6   petitioner's actual innocence claim focus on his convictions for intimidating a public servant,

7   arguing that he is actually innocent of those convictions because the statute was unconstitutional

8   as applied to him.  Petitioner does not cite to any cases demonstrating that actual innocence as to

9   one conviction can overcome the procedural default of a claim related to a wholly different

10  conviction.  The purpose of the actual innocence exception is to allow review of claims where a

11  "constitutional violation has probably resulted in the conviction of one who is actually innocent."

12  *Carrier*, 477 U.S. at 496; *see also Johnson v. Knowles*, 541 F.3d 933, 937 (9th Cir. 2008) (citing

13  *Schlup* for the proposition that "the miscarriage of justice exception is limited to those

14  *extraordinary* cases where the petitioner asserts his innocence and establishes that the court

15  cannot have confidence in the contrary finding of guilt") (emphasis in original).  As petitioner

16  has presented no new evidence undermining the Court's confidence in his conviction for

17  stalking, his actual innocence claim fails.  SAP Ground 7 should be denied.

18  C.     Evidentiary Hearing

19         Petitioner requests an evidentiary hearing regarding his ineffective assistance of appellate

20  counsel claim, which he raises in SAP Ground 2 and as cause and prejudice to excuse any

21  procedural default.  (Dkt. 125 at 24.)  As discussed previously, the Court need not reach the

22  merits of SAP Ground 2, and petitioner failed to properly exhaust his global ineffective

23

1    assistance of counsel claim. Therefore, the proposed evidentiary hearing would not resolve any

2    material issue, and petitioner's request should be denied.

3    D.    Motion to Expand the Record

4          Petitioner moves the Court, pursuant to Rule 7 of the Rules Governing Section 2254

5    Cases in the United States District Courts, to expand the record to include new evidence relevant

6    to his ineffective assistance of appellate counsel claim. (Dkt. 126.) Specifically, SAP Exhibits

7    90 and 106-114 (Dkt. 125-9 at 111; Dkt. 125-11 at 83-100; Dkt. 125-12 at 1-2) are not part of the

8    underlying record and were provided to petitioner through a request for his prior appellate

9    attorney's files. (Dkt. 126 at 1.) Petitioner asks the Court to consider this evidence for purposes

10   of determining cause and prejudice and also to substantively evaluate his ineffective assistance

11   of appellate counsel claim (SAP Ground 2). As discussed above, the Court does not reach the

12   merits of SAP Ground 2 and therefore need not decide whether to admit the evidence for that

13   purpose. Thus, the only question before the Court is whether the new evidence can be

14   considered for purposes of evaluating cause and prejudice. The Supreme Court has held that a

15   federal habeas court may not consider evidence of a claim that was not presented to the state

16   court where the claim was previously adjudicated on the merits in the state courts. *Cullen v.*

17   *Pinholster*, 563 U.S. 170, 185 (2011); *Dickens v. Ryan*, 740 F.3d 1302, 1320 (9th Cir. 2014) (en

18   banc). This prohibition, however, does not apply to claims that have not been "adjudicated on

19   the merits." *Dickens*, 740 F.3d at 1320 (holding that, in appropriate circumstances, a habeas

20   petitioner claiming ineffective assistance of counsel may present new evidence to demonstrate

21   cause and prejudice). Therefore, courts have held that a "petitioner may overcome a procedural

22   bar by presenting new evidence on the issues of cause and prejudice even in *Pinholster*'s wake."

23   *Quezada v. Scribner*, No. 04-7532, 2011 WL 3652245, at *9 (C.D. Cal. Aug. 19, 2011); *see also*

REPORT AND RECOMMENDATION - 44

1    *Clay v. Madden*, No. 17-3081, 2019 WL 7940590, at *49 (C.D. Cal. Sept. 3, 2019); *Ellis v.*

2    *Little*, No. 15-515, 2017 WL 386455, at *4 (D. Idaho Jan. 27, 2017); *Navarro v. Ryan*, No. 12-

3    1899, 2016 WL 6871855, at *2 (D. Ariz. Nov. 22, 2016).  Accordingly, the Court deems it

4    appropriate to grant petitioner's motion to expand the record for purposes of determining cause

5    and prejudice.

6                       V.       CERTIFICATE OF APPEALABILITY

7            A petitioner seeking post-conviction relief under § 2254 may appeal a district court's

8    denial of his federal habeas claims only after obtaining a certificate of appealability from a

9    district or circuit judge.  A certificate of appealability may issue only where a petitioner has

10   made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  A

11   petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the

12   district court's resolution of his constitutional claims or that jurists could conclude the issues

13   presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537

14   U.S. 322, 327 (2003).  Under this standard, the Court concludes that petitioner should be granted

15   a certificate of appealability with respect to SAP Ground 7.  A certificate of appealability should

16   be denied in all other respects.

17                              VI.      CONCLUSION

18           The Court recommends that (1) petitioner's second amended habeas petition (Dkt. 125)

19   be GRANTED as to SAP Ground 1 and DENIED as to all other claims; (2) petitioner's

20   convictions in Counts I and III be VACATED and the State be ordered to release petitioner

21   unless he is resentenced on the remaining convictions within 30 days of any order adopting this

22   Report and Recommendation; (3) petitioner's request for an evidentiary hearing be DENIED; (4)

23   petitioner's motion to expand the record (Dkt. 126) be GRANTED for purposes of deciding

cause and prejudice; and (5) a certificate of appealability be GRANTED as to SAP Ground 7 and DENIED as to all other claims.  A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed.  Failure to file objections within the specified time may affect your right to appeal.  Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed.  Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no timely objections are filed, the matter will be ready for consideration by the District Judge on **April 3, 2020**.

Dated this 6th day of March, 2020.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION - 46